UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ROSE M. PHILLIPS, Administratrix of )
the Estate of William Culpepper, Jr., et al. )
)                    Civil Action No. 3:17-CV-603-CHB
Plaintiffs, )
)
v. )                    **MEMORANDUM OPINION**
)                    **AND ORDER**
PTS OF AMERICA, LLC, et al., )
)
Defendants. )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by

Defendants Mississippi County, Missouri, William Dorris, Faith Altamirano, Cory Hutcheson,

and Keith Moore (collectively, the "Missouri Defendants"), [R. 130], and the Motion for

Summary Judgment filed by Defendants Correct Care Solutions, LLC ("Correct Care") and

LaShanti McKinney, [R. 149]. Plaintiffs have responded to both motions, [R. 134, R. 153], and

the defendants have replied, [R. 139, R. 155]. Plaintiffs also filed a sur-reply to the Missouri

Defendants' reply, [R. 143]. This matter has been fully briefed and is ripe for consideration. For

the reasons set forth herein, the Court will grant in part and deny in part the Missouri

Defendants' Motion for Summary Judgment and grant Correct Care and McKinney's Motion for

Summary Judgment.

## I.   BACKGROUND

On December 20, 2015, William Culpepper, Jr. was pulled over by police in Louisville,

Kentucky for failing to stop at a stop sign. [R. 149-1 (Arrest Citation)] He was then arrested on

an outstanding arrest warrant from Mississippi. *Id.* He was housed at Louisville Metro

Department of Corrections ("LMDC"), prior to his transport to Mississippi. His LMDC medical

- 1 -

records indicate that he was prescribed insulin and Metformin for diabetes, but he refused his medications on multiple occasions. [R. 151, pp. 6–11, 20–28 (LMDC Medical Records)]

The parties do not dispute that Culpepper left LMDC on January 29, 2016 in a van[1] owned by PTS of America, LLC ("PTS"), a prison transport service. The van was operated by three PTS employees: Richard Haskins, James Crook, and Elva Earnhart (collectively, the "PTS officers"). Culpepper would be transported to the Mississippi County Detention Center ("MCDC") in Charleston, Missouri, which is in Mississippi County, where he would stay overnight before being transported to his final destination, the Central Mississippi Correctional Facility in Pearl, Mississippi.

Before the PTS transport van departed, La-Shanti McKinney, a licensed practical nurse ("LPN") at LMDC, was called to the booking floor to provide the PTS officers with a supply of Culpepper's medications and paperwork. [R. 149-4, p. 46–48 (Deposition of La-Shanti McKinney)] Nurse McKinney was employed by Correct Care, which in turn contracted with LMDC to provide medical care to inmates. *Id.* at 8. Before heading to the booking floor, she reviewed Culpepper's chart to determine which medications he needed. *Id.* at 48. When she arrived in the booking area, Nurse McKinney was advised by an LMDC guard that Culpepper was complaining of abdominal pain. *Id.* at 47. She observed Culpepper lying on the ground in the fetal position. *Id.* 47, 49. She asked about his pain. *Id.* He told her that he had a history of ulcers and his stomach hurt. *Id.* Nurse McKinney noted that Culpepper was in a fetal position, but she did not note any other obvious signs of distress, such as sweating or agitation. *Id.* at 50–51.

---

[1] The van is sometimes referred to as a bus in the record. *See, e.g.,* [R. 135-1, p. 25]

Unsure whether Culpepper would be cleared for transport, Nurse McKinney then contacted Cody Pittman,[2] the Director of Nursing, for assistance. *Id.* at 51. Pittman accompanied Nurse McKinney back to the booking area. *Id.* at 46, 49. Nurse McKinney observed Pittman interacting with Culpepper and looking something up on the computer. *Id.* at 52. She believed that he was taking Culpepper's vital signs. *Id.* at 54. Nurse McKinney did not interact further with Culpepper and returned to her second-floor office. *Id.* A few minutes later, Pittman called Nurse McKinney back to the booking area so she could provide Culpepper's medications to a PTS officer. *Id.* at 69. She did so. *Id.* at 59. According to the testimony of the PTS officer, she advised Nurse McKinney and Pittman that Culpepper was complaining of a bleeding ulcer, but Nurse McKinney explained that there was no history of an ulcer in his file. [R. 149-2, p. 98 (Deposition of Elva Earnhart)] Nurse McKinney testified that a PTS officer told her and Pittman that the transport crew was behind schedule and Culpepper could be assessed in the next county. [R. 149-4, pp. 50, 57]

At approximately 11:45 a.m., Culpepper boarded the PTS van, which also held other inmates, and began the trip to MCDC. *Id.* at 40. At approximately 12:45 p.m., Culpepper complained of abdominal pain. [R. 149-2, p. 81]. One of the PTS officers contacted a nurse at LMDC and asked if he could give Culpepper an antacid, and then did so. [R. 149-7, pp. 50–53, 55]; *see also* [R. 149-2, p. 72] At approximately 6:45 p.m., a PTS officer checked Culpepper's blood sugar, which read over 600 mg/dl. [R. 149-2, p. 64–65; R. 148-8 (Earnhart Report)] A "normal" blood sugar reading is in the range of 75-100 mg/dl. *See Hawley v. Gelabert*, No. 1:06-CV-209, 2009 WL 2515685, at *4 (W.D. Mich. Aug. 14, 2009). Later that night, at approximately 11:06 p.m., a second blood sugar check again measured over 600 mg/dl. [R. 149-

---

[2] Cody Pittman could not recall interacting with Culpepper. *See, e.g.*, [R. 154-6, p. 9]

2, p. 64–65; R. 148-8 (Earnhart Report)] PTS officer Earnhart testified that she administered insulin to Culpepper after both blood sugar readings. [R 149-2, pp. 72–73]

The PTS van arrived at MCDC around 12:10 a.m.[3] on January 30, 2016. [R. 130-10, p. 36 (Supplemental Narrative Report by William Dorris)] Two other inmates were escorted from the van into the jail, where Faith Altamirano, an MCDC corrections officer, processed the admissions paperwork for those two inmates. [R. 135-1, p. 22 (Deposition of Faith Altamirano)] Video footage of the MCDC booking area shows that the PTS officers escorted these inmates into MCDC at approximately 12:16 a.m. [R. 136] At some point, the PTS officers informed the MCDC officers that an inmate, Culpepper, was refusing to leave the van. [R. 135-2, p. 16 (Deposition of William Dorris)] The PTS officers initially told the MCDC officers that the inmate was "being a problem," [R. 135-1, p. 27], and/or that he was being "unruly" and "refusing to move." [R. 135-2, pp. 15, 16].

William Dorris, an MCDC corrections officer and dispatcher, went to the van to assist. *Id.* at 17. He looked into the van and observed Culpepper on the floor, "just sitting there on his knees, kind of leaned over" with his eyes closed. *Id.* at 7, 22–24, 26. In his written report on the incident, Dorris stated that Culpepper appeared "disoriented." [R. 130-10, p. 36]; *see also* [R. 135-2, p. 39]. Dorris "shook" Culpepper, "and he opened his eyes but refused to get up." [R. 130-10, p. 36] Despite prompting from Dorris, Culpepper refused to leave the van. *Id.*; *see also* [R. 135-2, pp. 17–18] Plaintiffs argue that Culpepper was physically unable to get off the van. [R. 134, p. 6] Dorris testified that, while Culpepper was still in the van, one of the PTS officers informed him that Culpepper was "faking," but also that he had a blood sugar reading of over 600 mg/dl. [R. 135-2, pp. 17, 20, 28–29]

Culpepper was then carried into the facility by Dorris and a PTS officer at 12:18 a.m. [R. 135-2, p. 18] The video footage shows a PTS officer carrying Culpepper's upper body, and Dorris

---

[3] Plaintiffs argue that the van arrived "at midnight or shortly thereafter." [R. 134, p. 6]

carrying Culpepper's legs. [R. 136] Once inside the facility, Culpepper was laid on the floor because the officers felt that was the safest place for him, "just in case he was to fall or anything like that." [R. 135-2, p. 18] At this point, Dorris was again informed that Culpepper was a diabetic and had a blood sugar reading of over 600 mg/dl. *Id.* at 30. Dorris then told the PTS officers that Culpepper needed to go to the hospital, and he would need to be medically cleared before he could be admitted to the jail.[4] *Id.* at 29–30, 78. Meanwhile, Altamirano began the job of processing Culpepper's admission paperwork, but the PTS officers then informed her of Culpepper's blood sugar levels and that he was refusing his diabetes medication. [R. 135-1, p. 24] She also told the PTS officers that Culpepper would need to be medically cleared before he could be admitted to MCDC. *Id.* at 23. Dorris testified that PTS refused to call an ambulance because they believed Culpepper was faking. [R. 135-2, p. 31, 81–82].

Meanwhile, Culpepper was still lying on the floor, though he occasionally sat up and then laid back down again. [R. 136] At approximately 12:20 a.m., Dorris and a PTS Officer helped Culpepper to his feet and sat him in a nearby chair. *Id.* Video footage shows Dorris briefly speaking to Culpepper before walking down a hallway to another room. *Id.* Dorris testified that he returned to the dispatch room. [R. 135-2, p. 49] From the dispatch room, Dorris looked at the facility's camera footage and could see Culpepper "sitting there, moving around talking." *Id.* He testified that Culpepper "seemed fine." *Id.* at 35.  Soon after, however, he noticed Culpepper "bowed backwards in the chair." *Id.* at 49. Another MCDC officer entered the dispatch room to relieve Dorris, so he returned to Culpepper and "grab[bed] the chair and put his head into the chair." *Id.*; *see also id.* at 35–36. Altamirano confirmed in her testimony that there was a period of approximately ten minutes in

---

[4] Plaintiffs argue that "no discussion of this sort occurred until just prior to an ambulance being called by Dorris at 12:41 [a.m.]" but fail to cite to any evidence disputing Dorris's version of events. *Id.*

which Culpepper was "slumped backwards over a chair with his feet on one side and his head on the other." [R. 135-1, p. 61]

The video footage from the MCDC facility also confirms that Culpepper was unable to sit upright in the chair and paints a clearer picture of Culpepper's condition. [R. 136]. At approximately 12:22 a.m., Altamirano can be seen standing near the booking desk, which is only feet away from Culpepper. *Id.* She speaks to him, but he is not looking at her; instead, he is looking to his right, staring off, with his head faced toward the camera. *Id.* He appears to be zoned out. *Id.* Less than a minute later, a PTS officer takes Culpepper's right hand, which had been resting in Culpepper's lap, and drops it to his side. *Id.* This causes Culpepper to slump to the right, nearly falling out of the chair. *Id.* While that PTS officer looks at the chains securing Culpepper's feet, Culpepper starts to slump over and again nearly falls from the chair. *Id.* Two PTS officers catch him and hold him up to prevent him from falling. *Id.* At this point, Altamirano, who had been standing nearby at the booking desk, approaches. *Id.* The two PTS officers eventually stop supporting Culpepper and he begins to slump over again. *Id.* He continues to slump over, sliding farther out of his chair, as the PTS officers stand nearby and stare at him. *Id.* Altamirano stands nearby at the booking desk. *Id.* By 12:25 a.m., Culpepper is completely slumped over in the chair. *Id.* His head and arms are resting on the floor to the right of the chair, his back is against the seat of the chair, and his legs are splayed out toward the left of the chair. *Id.*

Culpepper stays in this position for the next several minutes as Altamirano finishes the admissions paperwork for the other two inmates. *Id.* At approximately 12:33 a.m., Dorris returns to the booking area. *Id.* He stands over Culpepper and looks at him, but then walks over to the booking desk to talk with Altamirano. *Id.* He wanders off screen and returns at approximately 12:34 with a pair of rubber gloves. *Id.* After putting the gloves on, he pulls an empty chair over to Culpepper,

grabs Culpepper's arm and lifts his upper body so that he can then place the empty chair beneath Culpepper's upper body. *Id.* Culpepper is not responsive. *Id.* Dorris returns to the booking desk area and talks with Altamirano and one of the PTS officers and can then be seen slowly walking around the booking area, picking up items from the floor and otherwise pacing about slowly. *Id.* The three officers are seen talking, and the PTS officer can be seen laughing multiple times. *Id.* At no point during this ten-to-fifteen-minute period did the PTS officers or the MCDC officers call for an ambulance.

The video does not have audio, but Dorris testified that, after witnessing Culpepper slumped over in the chair, he again told the PTS officers that Culpepper needed to go to the hospital. [R. 135-2, p. 51] Altamirano testified that she could not hear exactly what the PTS officers discussed at this point, but she thought they "were getting directions to the hospital." [R. 135-1 p. 35, 67] Dorris testified that the PTS officers made a phone call, ostensibly to their supervisor. [R. 135-2, p. 31]

At approximately 12:38 a.m., one of the other PTS officers returned to the booking area and talked with the other officers. [R. 136] Dorris and Altamirano were both present in the booking area at this point. *Id.* About a minute later, a PTS officer began putting restraints and handcuffs on Culpepper. *Id.* At roughly 12:41 a.m., Dorris "got tired of waiting on PTS" and called for an ambulance. [R. 135-2, pp. 43, 35–36, 54, 62–63; [R. 134-2, p. 3 (Ambulance Records)]. Around this same time, Dorris brought a wheelchair into the booking area so Culpepper could be wheeled into the MCDC lobby to meet the ambulance. [R. 136]; [R. 135-2, p. 79]; [R. 135-1, p. 64]. At this point, one of the PTS officers began dancing. [R. 136]

The officers eventually load Culpepper into the wheelchair, with some effort. *Id.* In the video, Culpepper appears unresponsive, and Dorris had to lift Culpepper's legs so the wheelchair could be turned around to face the exit. *Id.* At one point, Dorris held Culpepper's head so it did not slump over.

*Id.* According to Dorris's incident report, Culpepper was making a few audible noises at this point and moving his upper body slightly, but he was otherwise unresponsive. [R. 130-10, p. 36]; *see also* [R. 130-12, p. 16 (excerpts of deposition of PTS Officer James Crook)]. Altamirano testified that Culpepper was still alive when he was placed in the wheelchair. [R. 135-1, p. 63] The ambulance arrived at approximately 12:50 a.m., at which time Culpepper was unconscious and had no pulse. He could not be revived.

Both Cory Hutcheson, the MCDC Administrator, and Keith Moore, the Sherriff of Mississippi County, arrived later. Hutcheson testified that he received a call from Dorris at approximately 12:45 a.m. [R. 135-3, p. 9 (Deposition of Hutcheson)] Dorris explained that PTS had arrived with an inmate with a medical issue, so Dorris had called an ambulance. *Id.* at 9–10. By the time Hutcheson arrived at MCDC, Culpepper was deceased. *Id.* Moore also testified that Culpepper was deceased by the time of Moore's arrival at MCDC. [R. 135-4, p. 6] Moore further testified that the coroner was called and "took it over at that point." *Id.* at 7. An autopsy was completed, and it was ultimately determined that Culpepper's cause of death was a perforated duodenal ulcer. [R. 153-2, p. 6 (Coroner's Report)]

The administratrix of Culpepper's estate, his son, and his minor daughter (by and through her mother) filed the present action on December 21, 2016. [R. 1] In their Third Amended Complaint, [R. 78], they name as defendants Correct Care; Nurse McKinney; Mississippi County, Missouri; Sherriff Moore, individually; Administrator Hutcheson, individually; Dorris, individually; and Altamirano, individually. The following defendants were also named but have been dismissed: Louisville Metro Government; Mark Bolton, LMDC's Director; and PTS and its three employees, Haskins, Crook, and Earnhart. [R. 56; R. 111; R. 148]

Against these remaining defendants, Plaintiffs allege the following causes of action: deliberate indifference and gross negligence resulting in cruel and unusual punishment, deprivation of life, and denial of due process in violation of the Eighth and Fourteenth Amendments "and the Civil Rights Act of 1871, 42 U.S.C. § 1983"[5] (Count I, against all defendants); negligence and gross negligence (Count II, against Correct Care and all individual defendants); wrongful death under Kentucky Revised Statute ("KRS") § 411.130 (Count III, against all defendants); and vicarious liability for the state common law torts (Count IV, against Correct Care). [R. 78 at pp. 9–10]. Plaintiffs seek actual and punitive damages. *Id.* at 10.

The parties have conducted discovery, and the remaining defendants have now filed motions for summary judgment, [R. 130, R. 149]. The Court addresses each motion in turn.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by

---

[5] From the briefing, the Court understands Count I to be a 42 U.S.C. § 1983 claim for deliberate indifference to Culpepper's serious medical needs in violation of his Due Process rights under the Fourteenth Amendment.

demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

### III.  MISSOURI DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, [R. 130]

Plaintiffs' Third Amended Complaint raises the following causes of action against the Missouri Defendants: Count I, a 42 U.S.C. § 1983 claim for deliberate indifference of a serious medical need in violation of the Fourteenth Amendment; Count II, negligence and gross negligence (against the individual defendants only); and Count III, wrongful death. In its reply brief to the Missouri Defendants' Motion for Summary Judgment, Plaintiffs concede "that the results of discovery in this case [do] not support their wrongful death claim against the Missouri Defendants" and "Plaintiffs' state law claims against Defendant Mississippi County, Missouri for negligence and gross negligence are barred by the doctrine of sovereign immunity." [R. 134, p. 1, n.1] Accordingly, the Court will grant the Motion for Summary Judgment with respect to Count III (the wrongful death claim) against all Missouri Defendants and Count II (the negligence and/or gross negligence claim) against Mississippi County, Missouri. The Court addresses the remaining causes of action in turn.

### A.  42 U.S.C. § 1983 (Count I) – Defendants Dorris and Altamirano

As noted above, the Third Amended Complaint alleges that all Missouri Defendants are liable under Count I, the § 1983 claim, for showing deliberate indifference to Culpepper's serious medical needs in violation of his Due Process Rights under the Fourteenth Amendment.[6]

---

[6] As discussed below, the Eighth Amendment provides protection to convicted criminals, while the Fourteenth Amendment's Due Process Clause provides similar protections to pre-trial detainees like Culpepper. Accordingly, the relevant constitutional provision in this case is the Fourteenth Amendment. *See, e.g., Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983).

[R. 78, p. 9]. As to Defendants Dorris and Altamirano, Plaintiff argues that these officers were deliberately indifferent to Culpepper's serious medical needs by failing to timely call for an ambulance. The Missouri Defendants' arguments are disorganized and disjointed at times, but their arguments on Count I can best be summarized as: (1) lack of causation and (2) qualified immunity.[7] The parties also dispute the correct test to apply to a pretrial detainee's § 1983 claim based on deliberate indifference to a serious medical need.

The Court first considers the Missouri Defendants' qualified immunity arguments. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 601–02 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). To evaluate a qualified immunity defense, the Court considers two questions:

> First, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. If the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer is entitled to qualified immunity. If, however, the facts alleged are sufficient to establish a constitutional violation, then the Court must determine whether the particular right allegedly violated was clearly established at the time the violation occurred.

*Id.* at 602 (internal citations omitted).

Thus, in considering the defendants' qualified immunity argument, the Court must first determine if the facts, when viewed in the light most favorable to Plaintiffs, demonstrate that Defendants Dorris and Altamirano violated Culpepper's constitutional rights. This question, in turn, requires the Court to consider the parties' other arguments regarding the correct legal test to

---

[7] The Missouri Defendants do not argue that Mississippi County is entitled to sovereign immunity as to Count I.

apply to such claims, whether the evidence can satisfy that test, and whether causation is

required under the circumstances of this case.

>1. **Do the facts, when viewed in a light most favorable to Plaintiffs, demonstrate that Defendants Dorris and Altamirano violated Culpepper's constitutional rights?**

>>a. **The Correct Legal Test**

The Eighth Amendment prohibits prison officials from "unnecessarily and wantonly

inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's serious

medical needs. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting

*Estell v. Gamble*, 429 U.S. 97, 104 (1976)). Pretrial detainees are afforded the same protections

under the Fourteenth Amendment. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)); *Revere*

*v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983). A pretrial detainee's Fourteenth Amendment

deliberate indifference claim is analyzed "under the same framework for deliberate-indifference

claims brought by prisoners pursuant to the Eighth Amendment, including claims of inadequate

medical care." *Martin v. Warren County*, 799 F. App'x 329, 337 (6th Cir. 2020) (citation

omitted). Accordingly, a prison official's deliberate indifference violates a pretrial detainee's

constitutional rights when the official intentionally denies or delays access to medical care for a

serious medical need. *Blackmore*, 390 F.3d at 895 (citing *Estelle*, 429 U.S. at 104).

A deliberate indifference claim has both an objective and subjective component. *Id.*

(citations omitted). First, under the objective component, there must be a "sufficiently serious"

medical need. *Id.* (citations omitted). Under the subjective component, the inmate or detainee

must "show that the prison officials have 'a sufficiently culpable state of mind in denying

medical care.'" *Id.* (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)).

- 13 -

On this point, Plaintiffs argue that they should not be required to satisfy this objective-subjective test. Rather, they argue, the Court should adopt an "objective reasonableness test." [R. 134, pp. 8–10] Under this test, the Court need not inquire into the prison official's state of mind and instead should ask only whether the official's conduct was objectively reasonable. *Id.* at 8. For support, Plaintiffs cite to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), in which a pretrial detainee brought claims of excessive force against several jail officers. The case proceeded to trial, and the trial court instructed the jury to consider, among other things, the officers' states of mind. *Id.* at 394. The Supreme Court ultimately held that no subjective inquiry was required, and "a pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 396–97. Though this holding was made in reference to a pretrial detainee's claims of excessive force, Plaintiffs point to case law from the Second, Seventh, and Ninth Circuits, all of which have applied the *Kingsley* objective reasonableness test to a pretrial detainee's deliberate indifference claims. *See Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2nd Cir. 2018); *Miranda v. County of Lake*, 900 F.3d 335, 350–53 (7th Cir. 2018); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120 (9th Cir. 2018).

However, the Sixth Circuit has not expressly adopted the objective reasonableness test for claims of deliberate indifference. Nevertheless, Plaintiffs claim that the Sixth Circuit has shown a "willingness to consider" the objective reasonable test, citing *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018). [R. 134, p. 9] That case involved a pretrial detainee's claims of deliberate indifference to a serious medical need. The Sixth Circuit cited the objective-subjective standard, but in a footnote, it referenced the *Kingsley* decision, explaining that "[t]his Court has not yet considered whether *Kingsley* similarly abrogates the subjective intent requirement of a Fourteenth Amendment deliberate indifference claim," and many circuits are split on the issue.

885 F.3d at 938 n.3. However, in *Richmond*, neither party had cited to *Kingsley* or argued for its application. "Nonetheless," the Sixth Circuit explained, "we recognize that this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them." *Id.*

Plaintiffs also cited to an unpublished opinion from the United States District Court for the Eastern District of Kentucky, *Griffith v. Franklin County*, No. 3:16-cv-77, 2019 WL 1387691 (E.D. Ky. Mar. 27, 2019). In that case, Griffith alleged that he received inadequate medical treatment while being held in jail after his arrest, and the defendants moved for summary judgment. The district court acknowledged the traditional objective-subjective test applied to such claims, but found that the Supreme Court's holding in *Kingsley* "suggested that pretrial detainees no longer need to prove that the defendant had actual knowledge to succeed on the second prong of the deliberate indifference test." *Id.* at *3. Relying on *Kingsley*, the Court held that "a pretrial detainee-plaintiff can succeed by pointing only to objective facts and without proving the defendant's mindset." *Id.*  Plaintiffs ask this Court to adopt the same approach. [R. 134, pp. 9–10]

However, the Sixth Circuit has since considered the appeal of the *Griffith* decision, including the defendants' arguments that the *Kingsley* objective test did not apply to Griffith's claims. *See Griffith v. Franklin County*, 975 F.3d 554 (6th Cir. 2020).[8] The Sixth Circuit acknowledged the post-*Kingsley* circuit split as to whether the objective test should apply to conditions-of-confinement claims brought by pretrial detainees. *Id.* at 570. It declined to rule on the issue, however, finding that "Griffith cannot prevail under either test, and [we] therefore

---

[8] The Sixth Circuit's opinion was issued on September 21, 2020 and a request for rehearing en banc was denied on January 15, 2021, after the present motions had been submitted to the Court.

reserve the question for another day." *Id.* The Court explained, "Griffith's proof establishes, at

most, a negligence claim sounding in state tort law. And '[w]hatever *Kingsley* requires, it is more

than negligence.'" *Id* .at 571 (quoting *Martin*, 799 F. App'x at 338 n.4).

The Sixth Circuit ruled similarly in *Martin v. Warren County*, 799 F. App'x 329 (6th Cir.

2020), declining to address Martin's argument that the *Kingsley* test should apply to her claims

of deliberate indifference. Instead, the Court held that "she does not meet her burden at summary

judgment for reasons that do not depend on the standard for evaluating pretrial detainees'

deliberate-indifference claims." *Id.* at 337. In other recent cases, the Sixth Circuit has continued

to apply the traditional objective-subjective deliberate indifference test to medical mistreatment

claims involving pretrial detainees, without considering *Kingsley*. *See J.H. v. Williamson County*,

951 F.3d 709, 722–23 (6th Cir. 2020); *Winkler*, 893 F. 3d at 891.

Because the Sixth Circuit has not expressly ruled that the *Kingsley* objective test applies

to claims of deliberate indifference to a pretrial detainee's serious medical needs and it continues

to apply the objective-subjective test to such claims, this Court must apply that test here.

## b.  Objective Element (Serious Medical Need)

To satisfy the objective element of this two-part test, "a plaintiff must identify a serious

medical need, which is 'one that has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention.'" *Martin*, 799 F. App'x at 338 (quoting *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th

Cir. 2010) (internal quotation marks omitted)). For example, in *Blackmore v. Kalamazoo County*, 390

F.3d 890 (6th Cir. 2004), Blackmore, a pretrial detainee, "complained of 'sharp' and 'severe' stomach

pains for an extended period of time." *Id.* at 899. He also vomited, which was "a clear manifestation

of internal physical disorder." *Id.* Further, the jail officers deemed his condition to be serious enough

to place him in an observation cell, and he complained (both orally and in writing) for over two days before receiving medical care. *Id.* The Court examined these facts and concluded that "a jury could reasonably find that Blackmore had a serious need for medical care that was 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

In the present case, Dorris first observed Culpepper on the floor of the transport van (before 12:18 a.m. when he was carried inside), "just sitting there on his knees, kind of leaned over" with his eyes closed. [R. 132-5, pp. 7, 22–24, 26]. In his written report on the incident, Dorris stated that Culpepper appeared "disoriented." [R. 130-10, p. 36]; *see also* [R. 135-2, p. 39]. Dorris "shook" Culpepper, "and he opened his eyes but refused to get up" and refused to leave the van. [R. 130-10, p. 36]; *see also* [R. 135-2, pp. 17–18]. Dorris testified that, while Culpepper was still in the van, one of the PTS officers informed him that Culpepper had a blood sugar reading of over 600 mg/dl. [R. 135-2, pp. 17, 20, 28–29]

Culpepper was then carried into the facility by Dorris and a PTS officer. [R. 135-2, p. 18] Culpepper was laid on the floor because the officers felt that was the safest place for him, "just in case he was to fall or anything like that." *Id.* At this point, Dorris was again informed that Culpepper was a diabetic and had a blood sugar reading of over 600 mg/dl. *Id.* at 30. Meanwhile, Altamirano began processing Culpepper's admission paperwork, but the PTS officers also informed her of Culpepper's blood sugar levels. [R. 135-1, p. 24] During this time, Altamirano was just a few feet away from Culpepper, and could observe him lying on the floor.[9] [R. 136]

---

[9] Though Altamirano is not seen on the video when Culpepper is brought to the booking area, the other officers are seen talking with someone, presumably Altamirano, standing just behind the booking desk, only feet away from Culpepper. [R. 136] Altamirano later steps out from behind the desk. *Id.*

After a few minutes, Dorris and a PTS officer then lifted Culpepper and placed him in a chair (because Culpepper was not able to do so on his own). [R. 136] Dorris also testified to observing Culpepper as he sat in a chair. [R. 135-2, p. 49] At first, he observed Culpepper "sitting there, moving around talking." *Id.* However, he soon noticed Culpepper "bowed backwards in the chair." *Id.* at 49. Altamirano confirmed these events, testifying that, for a period of approximately ten minutes, Culpepper was "slumped backwards over a chair with his feet on one side and his head on the other." [R. 135-1, p. 61] Video footage from the MCDC facility also confirms that Culpepper was unable to sit upright in the chair, and that Altamirano and Dorris were in the booking area during this time. [R. 136]. The video shows that at times Culpepper's head was touching the floor and his legs were splayed to the other side of the chair. *Id.* In fact, Dorris at one point placed another chair under Culpepper's head and torso to keep him from falling further onto the floor. *Id.*

Under these circumstances, a reasonable jury could find that Culpepper presented with a serious medical need, and his need for medical attention was so obvious that even a lay person would have recognized it. *See Winkler*, 893 F.3d at 890 ("There is no question that [the detainee's] perforated duodenal ulcer, which ultimately caused his death, met this objective component." (citation omitted)). Accordingly, the Court turns to the subjective element of the deliberate indifference test.

### c. Subjective Element (State of Mind)

To satisfy the subjective component of the deliberate indifference test, the pretrial "detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Winkler*, 893 F.3d at 891 (quoting *Spears v Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)) (internal quotation marks omitted). "A defendant has a sufficiently culpable state of mind if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The Sixth Circuit has explained that "[t]his means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). In other words, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 896 (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994)) (internal quotation marks omitted).

However, "[a] plaintiff need not show that the defendant acted with the very purpose of causing harm," though he "must show something greater than negligence or malpractice." *Winkler*, 893 F.3d at 891 (citing *Farmer*, 511 U.S. at 835). Accordingly, the standard for this subjective element "has generally been equated with one of 'recklessness.'" *Id.* (quoting *Farmer*, 511 U.S. at 836).

This subjective element "must be addressed for each officer individually," *id.* (citations omitted), and it "should be determined in light of the prison authorities' current attitudes and conduct." *Blackmore*, 390 F.3d at 895 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)) (internal quotation marks omitted). Accordingly, the evidence must demonstrate that the individual defendant "was aware of facts from which he or she could infer a substantial risk of serious harm." *Winkler*, 893 F.3d at 891. This is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842) (internal quotation marks omitted).

Ultimately, to find that this subjective element has been satisfied, the evidence must demonstrate that (1) the individual defendant subjectively perceived facts from which to infer a

- 19 -

substantial risk to the detainee; (2) he or she did in fact draw that inference; and (3) he or she then disregarded that risk. *Jackson v. Wilkins*, 517 F. App'x 311, 317 (6th Cir. 2013) (citation omitted).

The Court finds that Defendants Dorris and Altamirano possessed the requisite states of mind to satisfy this subjective element. First, as noted above, a factfinder could infer that an officer knew of a substantial risk from the very fact that the risk was obvious. *Winkler*, 893 F.3d at 891. Here, the evidence demonstrates that Culpepper presented with an obvious medical need upon his arrival at MCDC, as explained above. From this obvious need, a jury could reasonably conclude that Dorris and Altamirano—both of who observed Culpepper's condition and were informed of his dangerously high blood sugar levels—knew of a substantial risk of harm to Culpepper and that he was seriously ill.

Further, other evidence supports the conclusion that Dorris subjectively perceived facts from which he could infer a substantial risk of harm to Culpepper. According to Dorris's version of events, Culpepper appeared disoriented at the time of his arrival, and a PTS officer told him multiple times that Culpepper's blood sugar level was 600 mg/dl. Dorris helped carry Culpepper into MCDC, witnessed him lying on the floor, helped into a chair, and witnessed him slumped over in the chair, largely unresponsive and unmoving, for several minutes.

A reasonable jury could also conclude that Dorris did in fact draw the inference that Culpepper was at a substantial risk of harm. For example, Dorris testified that he told the PTS officers "several times" that Culpepper needed to go to the hospital. [R. 135-2, p. 31]. He first told this to the PTS officers after Culpepper was brought into the jail and laid on the floor, after a PTS officer told him again that Culpepper had a blood sugar level of 600 mg/dl. *Id.* at 29–30. At this point, Dorris knew that Culpepper "needed to be checked out." *Id.* at 79. Dorris also testified

that he initially thought Culpepper "looked fine when he was sitting in the chair," but when Culpepper "laid down," Dorris "got concerned." *Id.* at 43. Dorris testified, "I didn't know what was going on with him. I just know he needed an ambulance." *Id.* at 44. Dorris further testified that, as a corrections officer, he would not assume that someone in Culpepper's situation was faking; he would assume that "[h]e needs to be seen by a doctor." *Id.*

With respect to Altamirano, a reasonable jury could conclude that she also subjectively perceived facts from which she could infer a substantial risk of harm to Culpepper. Altamirano was in the booking area when Culpepper was carried into MCDC and placed on the floor, and around that time, she was notified of Culpepper's high blood sugar reading. She was also present in the booking area when Culpepper was picked up and placed in a chair and when he began slumping in the chair. In fact, at one point, she is standing very close to him, talking directly to him, and he is looking off to the side, zoned out and unresponsive to her. Soon after, she witnesses him slumped over in the chair, and she is present in the booking area for the entire period that he is slumped over, just over ten minutes.

A reasonable jury could also review the evidence of record and conclude that Altamirano did in fact draw the inference that Culpepper was at a substantial risk of harm. For example, Altamirano testified that she told the PTS officers that Culpepper needed medical clearance before he could be admitted into MCDC. When asked about the specifics of that conversation, she replied, "I don't remember, honestly, what was said. All I know is we knew we had to get him out of the jail and get him medical because a blood sugar that high is bad." [R. 135-1, p. 28] When asked how she knew that the blood sugar levels were dangerous, she responded that "common sense tells you [to] seek medical attention. I mean, we've had people in the jail with high blood sugar and, you know, we've taken them to the hospital." *Id.*; *see also id.* at 41. She

also testified that she felt there was a connection between Culpepper's high blood sugar levels and his behavior. *Id.* at 34. She explained that she knew several individuals—including an aunt, cousins, and a good friend—with diabetes. *Id.* She testified, "I'm not an expert, but I knew the sugar was high enough to go to the hospital." *Id.*

Lastly, a reasonable jury could review the evidence of record and conclude that both Dorris and Altamirano disregarded the substantial risk of harm to Culpepper. As noted above, the PTS van carrying Culpepper arrived at MCDC at 12:10 a.m., but an ambulance was not called until 12:41 a.m. At the time of his arrival (or shortly thereafter), both Dorris and Altamirano were told that Culpepper's blood sugar was over 600 mg/dl, and they witnessed him being carried into MCDC (with Dorris carrying his legs), so sick he could not sit upright in a chair. Neither Dorris nor Altamirano called for an ambulance at this point, even after PTS officers refused to do so. From the booking desk only feet away from Culpepper, Altamirano continued to observe Culpepper slumped over in the chair for over ten minutes. She did not call for an ambulance and instead chose to finish the admissions paperwork for the other inmates. From the dispatch room, Dorris also observed Culpepper slumped over in the chair, but he did not return to the booking area for several minutes, at which point he pulled a chair under Culpepper's torso but did not otherwise provide aid or call for medical assistance. Rather, he can be seen on video meandering around the booking area, picking items up off the floor and talking with Altamirano and a PTS officer.  The PTS officer can be seen laughing at various points during the video. During this apparently light-hearted conversation, Culpepper was completely slumped over in the chair—clearly within eyeshot of Dorris and Altamirano, who were both only feet away. Simply stated, after Culpepper was carried into MCDC at 12:18 a.m., roughly twenty-three minutes passed before the ambulance was called at 12:41 a.m., during which time Culpepper was

in obvious distress and was largely unresponsive. Even so, Dorris and Altamirano failed to offer any medical assistance or seek medical help.

The Court has reviewed the evidence and has considered whether the subjective element can be satisfied with respect to Dorris and Altamirano, individually. *See Blackmore*, 390 F.3d at 895. A reasonable jury could look at this evidence and find these two individual defendants were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they both also drew that inference. A reasonable jury could also find that these defendants disregarded that known risk by failing to call for an ambulance as soon as it became apparent that the PTS officers refused to do so or were otherwise not acting quickly enough to address Culpepper's medical needs. *See Wilkins*, 517 F. App'x at 318–19 (affirming denial of summary judgment based on evidence that officers witnessed arrestee's violent collision with a dumpster and his "rapid physical deterioration" but delayed seeking medical care); *Scozzari*, 454 F. App'x 455, 464–65 (affirming denial of summary judgment based on evidence that officers knew detainee had been shot and recognized other signs of physical distress but delayed calling an ambulance and prevented paramedics from approaching the scene); *Estate of Owensby*, 414 F.3d 596, 604 (6th Cir. 2005) (affirming denial of summary judgment based on evidence that officers observed detainee's physical distress but made no attempt to summon medical care until several minutes later when they realized detainee was not breathing).

Accordingly, for purposes of evaluating the first step in the qualified immunity analysis—i.e., whether the evidence supports Plaintiffs' claims of a constitutional violation—the Court finds that a reasonable jury could review the evidence and conclude that Dorris and Altamirano violated Culpepper's Fourteenth Amendment right to adequate medical care.

### d.  Causation

The Missouri Defendants claim that they are entitled to summary judgment on Plaintiffs'

§ 1983 claim because Plaintiffs cannot prove that the Missouri Defendants' failure to provide

immediate medical assistance was the cause of Culpepper's death. [R. 130-1, pp. 7–8] They cite

to their own expert, Dr. W. Ray Silliman, who opined that Culpepper would have died regardless

of any medical treatment provided to him upon his arrival at MCDC. *Id.* at 7; *see also* [R. 130-4

(Ex. A, Opinion of Dr. Silliman)]. They also cite to Plaintiffs' expert, Dr. Robert Pfalzgraf, who

they claim "had no opinion as to the survivability of Mr. Culpepper once he reached MCDC, but

did question whether Mr. Culpepper was in fact salvageable." [R. 130-1, p. 7]; *see also* [R. 130-

5, pp. 6–7 (excerpts from deposition of Dr. Pfalzgraf)]. Relying on these opinions, the Missouri

Defendants argue that there is no evidence that their failure to call an ambulance sooner would

have saved Culpepper's life.

This argument overlooks the distinction between an obvious medical need and a non-

obvious one. As noted above, a serious medical need can either be a readily apparent condition

or a non-obvious one. *Martin*, 799 F. App'x at 338. The Sixth Circuit has explained the

significance of this distinction for summary judgment purposes:

> When a serious medical need is obvious, a plaintiff does not need to provide
> verifying medical evidence of harm. *Blackmore*, 390 F.3d at 899–900 (quoting
> *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). But when
> a serious medical need is not obvious and "is based on the prison's failure to treat
> a condition adequately, or where the prisoner's affliction is seemingly minor or
> non-obvious," plaintiffs must supply medical proof of injury at summary judgment
> so that we are able "to assess whether the delay [in adequate medical care] caused
> a serious medical injury." *Id.* at 898 (citing *Napier v. Madison County*, 238 F.3d
> 739, 742 (6th Cir. 2001)).

*Id.*

The Sixth Circuit has further explained the reasoning behind this distinction:

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the "detrimental effect" of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. *When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity.* In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.

*Blackmore*, 390 F.3d at 899 (emphasis added); *see also Scozzari v. Miedzianowski*, 454 F. App'x 455, 464 n.8 (6th Cir. 2012) (explaining that "'the delay alone . . . creates a substantial risk of serious harm.'" (quoting *Estate of Owensby*, 414 F.3d at 604)); *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir.1972) ("[W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." (citations omitted)). Accordingly, *in cases where the inmate or detainee's need for medical care was obvious*, "whether the delay actually worsened his injuries is irrelevant to the analysis." *Scozzari*, 454 F. App'x at 464 n.8 (emphasis added); *see also In re Miedzianowski*, 735 F.3d 383, 383–84 (6th Cir. 2013).

In the present case, the evidence demonstrates that Culpepper's serious need for medical care was obvious, as explained above. Thus, whether his delay in receiving medical treatment actually worsened his medical condition "is irrelevant to the analysis." *Scozzari*, 454 F. App'x at 464 n.8.

### 2. Was Culpepper's Right to Adequate Medical Care Clearly Established?

Because the evidence in the record is sufficient to establish a constitutional violation, the Court must next turn to the second prong of the qualified immunity test and determine whether the particular constitutional right alleged—here, the right to adequate medical care—was clearly established at the time of its violation. *See Estate of Owensby*, 414 F.3d at 602. The parties do

not dispute that a pretrial detainee has a constitutional right under the Fourteenth Amendment to adequate medical care, nor do they dispute that this right was clearly established at the time of Culpepper's death. Further, Sixth Circuit case law demonstrates that "the Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established." *Id.* at 604.

In sum, a reasonable jury could find that (1) Defendants Dorris and Altamirano violated Culpepper's Fourteenth Amendment right to adequate medical care, and (2) that right was clearly established at the time of his death. Accordingly, these defendants are *not* entitled to qualified immunity, and the Court will deny the motion for summary judgment as to Count I with respect to Defendants Dorris and Altamirano.

### B. 42 U.S.C. § 1983 (Count I) – Defendants Hutcheson and Moore

The Court must undertake a different analysis for Jail Administrator Cory Hutcheson and Sheriff Keith Moore. As noted above, these individuals were not present at MCDC at the time Culpepper arrived; they arrived after his death. Nevertheless, Plaintiffs refer to these individuals as "supervisory defendants" and argue that they can be held liable under § 1983 for their failure to train and supervise Dorris and Altamirano. [R. 134, p. 14–16] In other words, Plaintiffs argue that Hutcheson and Moore should be held vicariously liable for the MCDC officers' actions (or inactions) because they failed to adequately train or supervise them.

More specifically, Plaintiffs argue that they failed to train and supervise Dorris and Altamirano with respect to an MCDC policy requiring MCDC officers to respond to a medical emergency within four minutes. *Id.* That policy is included in a document entitled "MCDC Policy & Procedure: Access to Medical Care," and provides, "Detention staff will be trained to respond to health-related emergencies within a 4-minute response time. This training will be

provided by a responsible medical authority in cooperation with the Jail Administrator." [R. 134-4, p. 3]. Sheriff Moore testified that he was unaware of the four-minute policy, suggesting that it had been developed by the Jail Administrator, Cory Hutcheson. [R. 135-4, pp. 10–11] He also testified that he delegated to the Jail Administrator the responsibility of making sure that jail employees were properly trained and supervised. *Id.* at 9.  Hutcheson testified that he was aware of the policy. [R. 135-3, p. 16] He further testified that jail staff are advised to contact emergency medical services if they notice a health-related emergency, and they received medical training at various times. *Id.* at 16–17. For example, the jail provided in-house training by a nurse practitioner, and some of the corrections officers also received medication aid training. *Id.* at 17. Dorris and Altamirano testified that they had never been told to respond to a medical emergency within four minutes. [R. 135-1, p. 51; R. 135-2, pp. 58–59] Altamirano testified that she may have reviewed MCDC's written policies "at one point in time maybe when [she] first started." [R. 135-1, p. 52] Dorris could not recall reviewing the written policies. [R. 135-2, pp. 59–60]

The Sixth Circuit has explained, "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Reed v. Speck*, 508 F. App'x 415, 421 (6th Cir. 2012) (quoting *Gregory v. City of Louisville,* 444 F.3d 725, 751 (6th Cir. 2006)) (internal quotation marks omitted). To prove liability, the plaintiff must demonstrate "[m]ore than simple negligence and a right to control employees." *Id.* (citing *Gregory*, 444 F.3d at 751). Accordingly, "[t]o succeed on a failure to train or supervise claim, a plaintiff must show that the supervisor 'encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 712–13 (6th Cir. 2001)). Stated another way, the plaintiff "must prove that [the supervisors] did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory*, 444 F.3d at

751 (citation omitted). Accordingly, the Sixth Circuit has declined to impose supervisory liability where the supervisor-defendant was unaware of the events that gave rise to the § 1983 action—or, in other words, was unaware of his employees' allegedly unconstitutional conduct—and there was no evidence to show his direct participation or encouragement. *See Reed v. Speck*, 508 F. App'x 415, 421 (6th Cir. 2012).

In this case, there is no evidence that Hutcheson and Moore were aware even of Culpepper's arrival at the MCDC, much less his medical condition or the need for an ambulance, until *after* the ambulance had been called. There are simply no facts that could lead a reasonable juror to find either one encouraged the incident or the misconduct or participated in any way in the delay of medical care to Culpepper. Hutcheson testified that he received a call from Dorris at approximately 12:45 a.m., at which point Dorris explained the situation and noted that he had called an ambulance [R. 135-3, p. 9–10]. By the time Hutcheson arrived at MCDC, Culpepper was deceased. *Id.* Moore similarly testified that Culpepper was deceased by the time of Moore's arrival at MCDC. [R. 135-4, p. 6] Plaintiffs do not point to any evidence to contradict this testimony or to suggest that Hutcheson or Moore condoned or encouraged the MCDC officers to withhold medical care from Culpepper.

Plaintiffs also fail to present sufficient evidence on their specific argument that Hutcheson and Moore failed to train Dorris and Altamirano on the jail's medical emergency policy. This "inquiry regarding the inadequacy of the training 'must extend beyond the question of whether the individual officers involved were poorly trained.'" *Estates of Mills v. Knox County*, No. 11-208-GFVT, 2014 WL 1047147, *8 (E.D. Ky. Mar. 14, 2014) (quoting *Cooper v. Cty. of Washtenaw*, 22 F. App'x 459, 473 (6th Cir. 2007)).

- 28 -

Moore testified that he was unaware of the policy, as he had delegated that authority to the Jail Administrator. There is no evidence that this delegation of authority was improper. Hutcheson, in turn, testified that he *was* aware of the policy, that jail staff had been advised to contact emergency services in the event of a medical emergency, and that they received various forms of medical training. There is no evidence that these medical training sessions failed to include information about responding to a medical emergency, or that Hutcheson or Moore was aware of any such deficiency in the training.[10] Further, Plaintiffs do not cite to any facts indicating that Hutcheson or Moore was aware that the four-minute policy was not being followed (or that the training on said policy was inadequate or nonexistent), or that there was a history of slow response times to medical emergencies. They have also failed to identify any facts that demonstrate either Hutcheson or Moore allowed the jail to operate with knowledge that the medical emergency policy (or its implementation) exposed inmates to a substantial risk of harm. *See Winkler*, 893 F.3d at 899.

Further, the case relied upon by Plaintiffs, *Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir. 1995), is distinguishable. In that case, Taylor, a five-foot-tall, 120-pound male inmate with certain psychological problems, was transferred to a facility that housed its inmate in "dormitory style barracks" with sixty inmates to a room. *Id.* at 78. At this facility, Taylor was raped by another inmate. *Id.* He then brought a § 1983 claim against the warden, arguing that the warden was deliberately indifferent by failing to establish a policy or procedure to protect vulnerable inmates from being transferred to unsafe facilities. *Id.* at 78. When deposed, the warden admitted that he was responsible for reviewing and approving all prisoner transfers, but he would delegate that authority to others, as permitted by regulation. *Id.*

---

[10] Notably, one need not have special training to know to call 9-1-1 in response to a medical emergency.

at 80. However, the warden also admitted that he was aware that his direct designees would redelegate his authority to "lower echelon prison staff," without authorization; that he was not sure of the specific procedures for approving a transfer; and he had no procedures in place to ensure that his delegation authority was being properly used. *Id.* The Sixth Circuit affirmed the denial of summary judgment, explaining that a jury could find that the warden abandoned the duties of his position (namely, adopting and implementing transfer procedures) "in the face of actual knowledge of a breakdown in the proper workings of the department." *Id.* at 81.  Here, in contrast, there is no evidence that Hutcheson or Moore abandoned the duties of their position with actual knowledge of a breakdown in the proper workings of MCDC or, specifically, the implementation of its medical emergency policy.

Accordingly, the Court finds that there is no genuine dispute of material fact as to whether Defendants Hutcheson and Moore violated Culpepper's constitutional rights by failing to adequately train and supervise Dorris and Altamirano. With respect to Defendants Hutcheson and Moore, the Court will grant the motion for summary judgment as to Count I.

### C.  42 U.S.C. § 1983 (Count I) – Defendant Mississippi County, Missouri

The Supreme Court has explained that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978). However, the Supreme Court has made clear that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Instead, counties and other municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision

officially adopted and promulgated by that body's officers." *Id.* Accordingly, to prove "a municipal-liability claim under § 1983, the plaintiff must allege the deprivation (1) of a right secured by the Constitution or laws of the United States, (2) that was directly caused by a municipal policy or custom." *Nichols v. Wayne Cnty., Michigan*, 822 F. App'x 445, 449 (6th Cir. 2020) (citing *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017)).

In the present case, Plaintiffs do not point to any allegedly unconstitutional formal or informal policy or custom, nor do they argue that any constitutional violation "was directly caused by a municipal policy or custom." *Id.* They identify an MCDC policy requiring MCDC officers to respond to medical emergencies within four minutes, [R. 134-4], but they do not argue that this policy is unconstitutional. Rather, they point to the four-minute policy to argue that Hutcheson and Moore are liable because they failed to adequately train Dorris and Altamirano on that policy. From there, Plaintiffs argue that "the fault of Moore and Hutcheson can be directly imputed to Defendant Mississippi County." [R. 134, p. 16] This is Plaintiffs' only argument for imposing liability against Mississippi County under Count I. However, as explained above, the evidence does not support Plaintiffs' claims of supervisory liability against Hutcheson and Moore, and typically this precludes liability against the municipality. "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citation omitted).

On this point, the Court acknowledges that the Sixth Circuit recently considered whether a municipality could be held liable under § 1983 even when no individual defendant is found to have committed a constitutional violation. *See Winkler*, 893 F.3d at 899–903. The Court examined case law from this and other circuits indicating that, under certain circumstances, a

constitutional violation may be attributable to a municipality but not its employees. *Id.* at 900–901. While the Sixth Circuit did not affirmatively resolve that question, it at least suggested that a municipality could be found liable under § 1983 if it implemented a policy or custom that caused a constitutional violation, even if the offending employee was exonerated or immune from suit. *Id.* at 901. To do so, the plaintiff must still demonstrate that the municipality's policy or custom caused his or her injury, and that a "direct causal link" existed between that policy/custom and the constitutional deprivation. *Id.*

More specifically, in the context of a failure-to-train theory, a plaintiff must demonstrate "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Id.* at 902 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)) (internal quotation marks omitted).

As to the first element, "an inquiry regarding the inadequacy of the training 'must extend beyond the question of whether the individual officers involved were poorly trained.'" *Estates of Mills*, 2014 WL 1047147, at *8 (quoting *Cooper*, 22 F. App'x at 473). The Court should instead consider "whether such inadequate training can justifiably be said to represent 'city policy.'" *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 379, 388 (1989)) (internal quotation marks omitted). In the present case, neither Dorris nor Altamirano recalled receiving training on the four-minute response policy, but their unsatisfactory training, without more, will not satisfy this first element. *Id.* (explaining that a single officer's unsatisfactory training may be due to factors other than a faulty training program). Plaintiffs do not present any evidence that the training

programs themselves were deficient, and they therefore fail to demonstrate that "the training or supervision was inadequate for the tasks performed." *Winkler*, 893 F.3d at 902.

Even if Plaintiffs could demonstrate inadequate training, they must also prove that the inadequacy was the result of the county's deliberate indifference. To satisfy this second element, Plaintiffs must show that the county failed to "provide adequate training in light of foreseeable consequences that could result from a lack of instruction" or a failure to act "in response to repeated complaints of constitutional violations by its officers." *Id.* (quoting *Ellis*, 455 F.3d at 700–01) (internal quotation marks omitted). In the present case, the latter of these two modes of proof is inapplicable, as Plaintiffs have not presented any evidence of any previous complaints related to the MCDC officers' responses to medical emergencies. Thus, in order to demonstrate the county's deliberate indifference, Plaintiffs must prove that the county failed to "provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Id.*

This mode of proof is available "'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Id.* at 903 (quoting *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 739 (6th Cir. 2015)). In other words, this applies if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *City of Canton v. Harris*, 449 U.S. 378, 390 (1989)).

This standard was examined by the Sixth Circuit in *Shadrick v. Hopkins County, Kentucky*, 805 F.3d 724 (6th Cir. 2015), cited by Plaintiffs. In that case, a county contracted with a private healthcare entity to provide medical services to inmates at the county jail. *Id.* at 728–29.

- 33 -

The healthcare entity knew that its LPN nurses interacted with a large number of inmates presenting with a wide range of medical conditions, many of which required timely and accurate diagnosis and treatment. *Id.* at 739. Yet, the nurses received virtually no training specific to inmate health care. They were not trained on "assessing and documenting medical conditions of inmates, obtaining physician orders, providing ordered treatments to inmates, monitoring patient progress, or providing necessary emergency care to inmates within the jail environment in order to avoid constitutional violations." *Id.* at 740. They lacked authority to diagnose medical conditions, but "were routinely confronted with frequent and competing demands for medical care arising from the needs of numerous inmates suffering from maladies of varying severity." *Id.* The Sixth Circuit explained, "It is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates." *Id.* The Court therefore found that a reasonable jury could determine that the entity's "failure to train and supervise its LPN nurses in meeting their constitutional obligations demonstrates [the entity's] own deliberate indifference to the highly predictable consequence that an LPN nurse will commit a constitutional violation." *Id.*

In *Shadrick*, there was no training program in place for the LPN nurses. As a result, they lacked "the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting," and this created an obvious potential risk that those nurses would commit constitutional torts. *Id.*; *see also Russo v. City of Cincinnati*, 953 F.2d 1036, 1046–47 (6th Cir. 1992) (failing to train officers on use of force against mentally disturbed persons). In contrast, in this case, there is no evidence that the MCDC officers lacked the essential knowledge, tools, preparation, or authority to identify a medical emergency and respond to it in a timely fashion. Nor is there evidence that any special knowledge, tools,

preparation, or authority were required to respond to Culpepper's medical emergency. To put it simply, the only thing the MCDC officers needed to do was pick up a phone and dial 9-1-1. This requires no special training or tools. Thus, even assuming that the county's medical emergency training was inadequate, there is simply no evidence of an obvious need for more training or that the failure to train Dorris and Altamirano on a four-minute response time would lead them to act with such deliberate indifference to an inmates serious medical needs.

Further, even if Plaintiffs could demonstrate that the officers' training was inadequate and the inadequacy was the result of the county's deliberate indifference, the inadequacy must be closely related to or actually cause the injury. In other words, Plaintiffs "must still prove that the deficiency in training actually caused the [MCDC] officers' indifference to [Culpepper's] medical needs." *City of Canton*, 489 U.S. at 391. In the present case, the evidence establishes that Dorris and Altamirano recognized Culpepper's obvious serious medical need. They were both aware of his high blood sugar and both witnessed him falling out of consciousness and slumping out of his chair. They testified that they knew he needed immediate medical attention. Yet, for several minutes, they refused to call for an ambulance—an act that takes no special training or equipment. There is no evidence that the officers would have acted any differently had they been trained on the four-minute policy. That is, even a child has the life skills training to call 9-1-1 in response to a medical emergency. The problem is that Dorris and Altamirano failed to make that call.

Plaintiffs have therefore failed to demonstrate that the county can be held liable under Plaintiffs' failure-to-train theory. They have not identified a municipal policy or custom that resulted in a constitutional violation, nor have they cited to facts demonstrating a failure to train that rose to the level of deliberate indifference that caused Culpepper's injury. Accordingly, the

Court will grant the motion for summary judgment on Count I with respect to Defendant Mississippi County.

In sum, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Defendants Dorris and Altamirano acted with deliberate indifference to Culpepper's serious medical needs, and these defendants are not entitled to qualified immunity. The Court will therefore deny the Missouri Defendant's motion to the extent it seeks summary judgment on Count I for Defendants Dorris and Altamirano. However, the evidence does not support a claim of supervisory liability against Defendants Hutcheson and Moore or a claim of vicarious liability (or direct liability) against the county. The Court will therefore grant the Missouri Defendant's motion to the extent it seeks summary judgment on Count I for Defendants Hutcheson, Moore, and Mississippi County.

### D. Negligence and/or Gross Negligence (Count II) – Dorris, Altamirano, Hutcheson, and Moore

Count II alleges that certain defendants were negligent and grossly negligent. [R. 78, p. 10] The Third Amended Complaint asserts this cause of action only against PTS (now dismissed), Correct Care, and all individual defendants. *Id.* Further, as noted above, Plaintiffs concede that the county is shielded by the doctrine of sovereign immunity with respect to this claim. [R. 134, p. 1, n.1] The Court therefore considers only the Missouri Defendants' arguments that the individual defendants (Dorris, Altamirano, Hutcheson, and Moore) are entitled to summary judgment on Count II. These defendants make several arguments as to why they are entitled to summary judgment on this claim. The Court finds that the Missouri Defendants are entitled to summary judgment on Count II because there is an absence of a genuine issue of material fact as to causation, and the Court therefore does not address the Missouri Defendants' remaining arguments.

On the issue of causation, the Missouri Defendants again cite to their expert, Dr. Silliman, who opined that Culpepper would have died regardless of any medical treatment provided to him upon his arrival at MCDC. [R. 130-1, p. 14]; *see also* [R. 130-4 (Ex. A, Opinion of Dr. Silliman)]. They also cite to Plaintiffs' expert, Dr. Pfalzgraf, who did not express an opinion on Culpepper's treatment by the MCDC officers or whether there was "any hope of survivability of Mr. Culpepper once he got to Mississippi County." *See* [R. 130-5, pp. 6–7 (excerpts from deposition of Dr. Pfalzgraf)]. Relying on these opinions, the Missouri Defendants argue that there is no evidence that their actions or inactions would have saved Culpepper's life.

The Missouri Defendants have therefore "inform[ed] the district court of the basis for [their] motion, and identif[ied] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [they] believe demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Essentially, they have demonstrated an *absence* of a necessary element of the negligence claim. The burden is therefore on Plaintiffs to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc.*, 48 F.3d at 205 (citation omitted). In fact, "the nonmoving party has an *affirmative duty* to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655 (emphasis added). The Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.*

Plaintiffs do not point to any specific facts or portions of the record to counter the Missouri Defendants' causation arguments as to the negligence/gross negligence claim. Instead, they argue that these individual defendants did not have to cause Culpepper's death for liability

to attach under Count II. Plaintiffs cite to the standard elements of a negligence claim: "duty, breach of duty, and resulting injury," or causation. [R. 134, p. 17]; *see also Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88–89 (Ky. 2003)).[11] They then argue, "Plaintiffs need no expert testimony to demonstrate that Culpepper experienced unalleviated suffering as a consequence of a 20-minute delay in attention to his obviously serious medical needs, when a jury can see it with their own eyes." Plaintiffs provide no further explanation or argument regarding causation with respect to the negligence/gross negligence claims. Notably, however, when addressing the Missouri Defendants' causation arguments in relation to the § 1983 claim, Plaintiffs state: "Did the Missouri Defendants' conduct cause Culpepper's death? Probably not." [R. 134, p. 13]

In sum, the Missouri Defendants have demonstrated the absence of a genuine issue of material fact, and Plaintiffs have failed to satisfy their burden of identifying "specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655 (emphasis added); *see also Colston v. Regency Nursing, LLC*, No. 3:16-cv-0050-GNS, 2018 WL 775367, *4 (W.D. Ky. Feb. 7, 2018). In fact, the evidence of record, including the expert testimony, demonstrates a lack of causation between the Missouri Defendants' actions (or inactions) and Culpepper's death. Unlike Plaintiffs' § 1983 claim against these defendants, causation is a necessary element of Plaintiffs' negligence claims. *See Wright*, 381 S.W.3d at 213. Plaintiffs have failed to demonstrate a genuine issue of material fact as to this essential element. Accordingly, with respect to Count II (negligence and/or gross negligence), the Court will grant

---

[11] Plaintiffs briefly argue that Missouri law controls their negligence claim because these defendants are Missouri citizens and their alleged misconduct occurred in Missouri. [R. 134, p. 17] However, in both Kentucky and Missouri, the elements of a common law negligence claim are the same: duty, breach of duty, and causation. *See Wright*, 381 S.W.3d at 213; *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc.*, 700 S.W.2d 426, 431 (Mo. 1985).

the Missouri Defendants' Motion for Summary Judgment, as to William Dorris, Faith

Altamirano, Cory Hutcheson, and Keith Moore.

## IV. CORRECT CARE AND MCKINNEY'S MOTION FOR SUMMARY JUDGMENT, [R. 149]

Plaintiffs' Third Amended Complaint raises the following causes of action against

Correct Care and Nurse LaShanti McKinney: Count I, a 42 U.S.C. § 1983 claim for deliberate

indifference in violation of the Fourteenth Amendment; Count II, negligence and gross

negligence; and Count III, wrongful death. Plaintiffs also assert a vicarious liability claim against

Correct Care in Count IV. The Court addresses each cause of action in turn.

### A. 42 U.S.C. § 1983 (Count I) – Nurse McKinney

As explained above, the traditional objective-subjective test applies to a pretrial

detainee's § 1983 claim for deliberate indifference to a serious medical need. For the reasons set

forth below, the Court finds that neither element can be met with respect to Defendant

McKinney.

#### 1. Objective Element (Serious Medical Need)

As noted above, a serious medical need is "one 'that has been diagnosed by a physician

as mandating treatment or one that is so obvious that even a lay person would easily recognize

the necessity for a doctor's attention.'" *Martin*, 799 F. App'x at 338 (quoting *Jones*, 625 F.3d at

941). A medical need that is "so obvious that even a lay person" would recognize it does not

require verifying medical proof that the delay in care caused a serious medical injury. *See, e.g.*,

*Blackmore*, 390 F.3d at 898. However, for deliberate indifference claims "involving minor

maladies or non-obvious complaints of a serious need for medical care," medical evidence of

causation is required. *Blackmore*, 390 F.3d at 898.

When considering Plaintiffs deliberate indifference claim against Nurse McKinney, the Court must consider the obviousness of Culpepper's medical need at the time of Nurse McKinney's involvement in his case. Nurse McKinney testified that her first interaction with Culpepper was on the evening of his transport to MCDC, when she brought his medications and paperwork to the PTS officers. [R. 149-4, p. 45] She testified that, when she arrived in the booking area where Culpepper was waiting for transport, he was lying on the floor in the fetal position. *Id.* at 49. An LMDC officer advised her that Culpepper was complaining of stomach pain. *Id.* Nurse McKinney approached Culpepper and asked him what was wrong, at which point he told her that he had a history of bleeding ulcers. *Id.* She testified that, other than lying in a fetal position, he "didn't have any other signs of pain," e.g., he was not sweating or agitated and there were "[n]o obvious signs of distress." *Id.* at 50–51. This testimony is corroborated by PTS Officer Earnhart's testimony. [R. 149-2] Earnhart noted that Culpepper complained of an ulcer and held his hand against his stomach, *id.* at 97–98, but she described Culpepper as engaging in "normal conversation" and noted that he did not appear to be in "agonizing pain." *Id.* at 79–80. Further, this was Nurse McKinney's only direct interaction with Culpepper. When she observed him later (as he was being attended to by the nursing director), he was at one point lying on a bench, on his back, with one knee drawn up and one leg extended. *Id.* at 56. When she finally met with the PTS officers to provide his medications and paperwork, he was sitting on the bench, leaning forward with his hands cuffed in front of him. *Id.* at 56–57.

Based on this evidence, a reasonable jury could not find that Culpepper presented to Nurse McKinney with an obvious serious medical need. "[O]bvious manifestations of pain and injury" include complaints of sharp and severe stomach pains for an extended period of time (over forty-eight hours) and vomiting, *Blackmore*, 390 F.3d at 899; seizures, *Griffith*, 975 F.3d at

565; and a fever accompanied by vomiting, *Shade v. Middletown, Ohio*, 200 F. App'x 566, 569 (6th Cir. 2006). The Sixth Circuit has also held that an unresponsive inmate lying face down and exhibiting symptoms of alcohol-withdrawn delirium exhibited an obvious medical need. *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907 (6th Cir. Feb. 2, 2009). Here, Culpepper complained of stomach pain immediately before his transport, but his medical records did not note any previous complaints of stomach pain or any history of ulcers. He did not become disoriented and unresponsive until after he left LMDC. Under these specific facts, a one-time complaint of stomach pain, with nothing more, is not comparable to the obvious serious medical needs identified in the Sixth Circuit precedent cited above. Nor is it comparable to Culpepper's obvious serious medical condition at the time he arrived at MCDC, when he could not walk unassisted or sit up in a chair on his own, and he had a documented blood sugar reading of over 600 mg/dl.

This is not to say that Culpepper's medical needs were not serious. Clearly, he suffered from a perforated ulcer which ultimately resulted in his death. However, because Culpepper's serious medical need was not obvious at the time of McKinney's involvement, Plaintiff must provide verifying medical evidence of causation. Plaintiffs fail to point to any such evidence, and as a result, their § 1983 deliberate indifference claim against Nurse McKinney must fail.

### 2. Subjective Element (State of Mind)

Even assuming that Culpepper presented to Nurse McKinney with an obvious serious medical need, the evidence does not demonstrate that she was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, nor does it demonstrate that she drew that inference and disregarded that risk. *See Winkler*, 893 F.3d at 891. It is true that a jury can conclude "that a prison official knew of a substantial risk from the very fact that the

risk was obvious." *Winkler*, 893 F.3d at 891 (quoting *Farmer*, 511 U.S. at 842) (internal

quotation marks omitted). However, even assuming the need was obvious in this case, "[a]

doctor's errors in medical judgment or other negligent behavior do not suffice to establish

deliberate indifference." *Griffith*, 975 F.3d at 568 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 738

(6th Cir. 2018)) (internal quotation marks omitted). Thus, "[w]here the plaintiff has received

some medical treatment, 'federal courts are generally reluctant to second guess medical

judgments and to constitutionalize claims which sound in state tort law.'" *Id.* (quoting *Burgess v.*

*Fischer*, 735 F.3d 462, 477 (6th Cir. 2013)) (internal quotations omitted). For example, in *Shade*,

the Sixth Circuit concluded that a nurse's treatment represented a reasoned and good-faith effort

to treat the inmate-patient's symptoms (fever and vomiting), and her actions "clearly did not

exhibit the recklessness or callous disregard for the plaintiff's well-being that was exemplified in

*Blackmore*," a case in which jail officials refused to seek medical care for an inmate complaining

of sharp and severe stomach paints for over two days. 200 F. App'x at 570.

      In the present case, Nurse McKinney's conduct is more like the reasoned, good faith-

effort of the nurse in *Shade* than the reckless jail officials in *Blackmore*. When Nurse McKinney

was advised that Culpepper had complained of stomach pain, she approached him and asked

about his pain. [R. 149-4, p. 49] She observed him lying in the fetal position, but otherwise

detected no obvious signs of distress. *Id.* at 50–51. When Culpepper told her that he had a history

of bleeding ulcers, she immediately contacted her nursing director to see if Culpepper would be

cleared for transport. *Id.* at 47. Pittman then followed her to the booking area and began

engaging with Culpepper. *Id.* She witnessed the nursing director place an oxygen sensor on

Culpepper and then she returned to the nurses' station. *Id.* at 77.  Nurse McKinney had no further

contact or direct interaction with Culpepper.  She was ultimately advised by the nursing director

that Culpepper was cleared for transport and was told that the PTS officers would have him checked out in the next county. *Id.* at 71. Plaintiff fails to identify any action or inaction by Nurse McKinney that would constitute any level of indifference to Culpepper's claims, much less rise to the level of recklessness or callous disregard necessary for this deliberate indifference claim.

On this point, the Court notes Plaintiffs' argument that a reasonable jury could conclude that McKinney did *not* call Pittman, the Director of Nursing, for assistance. *See, e.g.*, [R. 153, p. 6]. Plaintiffs point to two pieces of evidence. First, in Pittman's deposition, he stated that he did not recall seeing or interacting with Culpepper. *See, e.g.*, [R. 154-6, pp. 13–14] He explained that, if he were consulted about an inmate complaining of medical problem prior to transport, he would have documented that assessment. *Id.* at 14. There is no such documentation in the record. Next, Plaintiffs point to the deposition of PTS Officer Earnhart, and specifically, her testimony that McKinney, not Pittman, advised Earnhart that Culpepper had no history of ulcers in his medical records. [R. 149-2, p. 117] Relying on this evidence, Plaintiffs argue that a reasonable jury could believe that McKinney never sought assistance and instead released Culpepper for transport herself, something well beyond her authority to do. [R. 153, pp. 6, 15]

First, the Court finds that McKinney's testimony is corroborated by other reliable evidence of record. For example, PTS Officer Earnhart testified that a female member of the medical staff came to the booking area to provide Culpepper's medications. [R. 149-2, pp. 61, 115] She eventually identifies that female staff member as Nurse McKinney. *Id.* at 60–61, 98. Earnhart explained that a male member of the medical staff came down to the booking area with McKinney later. *Id.* at 115. She could not remember his name or title. *Id.* at 62. She testified that she told both the male and Nurse McKinney that Culpepper had complained of an ulcer, and she

believed that it was Nurse McKinney who stated that his records did not reflect a history of

ulcers, but she was "not 100 percent [certain]" that it was McKinney who stated this. *Id.* at 117.

Both Nurse McKinney and the male staff member were present for that conversation. *Id.*

Earnhart was not asked if the male staff member talked with or assessed Culpepper.

Additionally, Pittman acknowledged his signature on Culpepper's Patient Prescription

Eligibility Form. [R. 154-6, p. 13] McKinney testified that this form ensured that an inmate

would have his or her prescriptions with him once he arrived at his destination. [R. 149-4, p. 43]

She testified that she brought this form (unsigned) with her to the booking area, and it would

have been signed once the medications were handed over to the PTS officer. *Id.*  This further

corroborates Nurse McKinney's version of events—specifically, her testimony that Pittman was

present in the booking area and approved Culpepper for transport.

Further, Pittman's testimony does not contradict McKinney's version of events. Pittman

testified that he cannot remember attending to Culpepper, but he never denies that he did, in fact,

accompany Nurse McKinney to the booking area to assess Culpepper. At one point, he is asked

whether he is testifying that he never assessed Culpepper or whether he is testifying that he

cannot recall assessing Culpepper. [R. 154-6, pp. 42–43] He responds, "It's my testimony that [I]

cannot recall if I was with her assessing the patient." *Id.* at 43. He is then asked, "So it might

have happened, you just might not recall it?" *Id.* He responds, "Correct." *Id.* He explains that it

was his practice to document an assessment of a patient, and there is no such documentation in

this case. *Id.* at 43–44. However, even this testimony does not contradict Nurse McKinney's

version of events. Nurse McKinney did not witness Pittman performing a full assessment[12] (e.g.,

taking vital signs); she testified that she saw him with the equipment necessary for taking vital

---

[12] One of the PTS officers advised Pittman and McKinney that Culpepper could be medically assessed in the next
county.

signs (e.g., a blood pressure machine) and that he went over to Culpepper "with the pulse ox on his finger." [R. 149-4, p. 54] At this point, she left the booking area. *Id.* She did not observe Pittman taking Culpepper's vital signs. *Id.* at 61. Thus, while Pittman's testimony does not necessarily corroborate Nurse McKinney's testimony, it certainly does not contradict it.

To be clear, the Court does not "weigh the evidence and determine the truth of the matter" at the stage of the proceedings. *Anderson*, 477 U.S. at 249. However, "[t]he trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'" *Alba v. Marietta Mem'l Hosp.*, 202 F.3d 267, *3 (6th Cir. 2000) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989)). Thus, the Court must consider whether the respondents have identified more than "[t]he mere existence of a scintilla of evidence in support of [the respondent's] position." *Anderson*, 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 250 (citations omitted). "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Alba*, 202 F.3d at *3 (quoting *Street*, 886 F.2d at 1479). With respect to Plaintiffs' theory that Nurse McKinney fabricated her testimony, never consulted Pittman, and approved Culpepper's transport without authority, the Court finds that Plaintiffs have failed to produce more than a mere scintilla of evidence to support that theory.

Accordingly, the Court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact as to both the objective and subjective elements of their deliberate indifference claim against Nurse McKinney. The Court will therefore grant summary judgment on Count I as to Defendant McKinney.

### B.  42 U.S.C. § 1983 (Count I) – Correct Care

A private entity may be held liable under § 1983 when that entity contracts with the state to perform a traditional state function, such as providing medical services to prison inmates. *West v. Atkins*, 487 U.S. 42, 54 (1988). When considering a § 1983 claim against a private entity, a court should undertake the same analysis outlined above for § 1983 claims against municipalities. *See supra* Section III(C); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (citation omitted). As noted above, a municipality generally cannot be held liable under § 1983 "[i]f no constitutional violation by the individual defendants is established." *Watkins*, 273 F.3d at 687 (citation omitted). Under the holding in *Watkins*, because the evidence does not support Plaintiffs' § 1983 claim against Nurse McKinney, Correct Care cannot be held liable under § 1983.

But, even assuming that a municipality (or its medical contractor) can be held liable under § 1983 in the absence of individual liability, *see Winkler*, 893 F.3d at 899–903, Plaintiffs' claims against Correct Care would still fail for lack of proof. Plaintiffs argue that Correct Care is liable for its failure to develop written procedures for screening inmates prior to transport and its failure to train Nurse McKinney on how to properly evaluate an inmate for transport. [R. 153, pp. 16–17] As noted above, to succeed on this failure-to-train theory of liability, Plaintiffs must demonstrate "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902. The same analysis applies to their theory that Correct Care failed to adopt a written policy on prisoner transport assessments. *See Jackson v. City of Cleveland*, 925 F.3d 793, 828 n.20 (6th Cir. 2019) (declining to address failure-to-adopt-policy theory separate from failure-to-train theory because "the harm

alleged and the analysis required under the failure-to-train theory are functionally indistinguishable from the harm Plaintiffs allege and the analysis they wish us to conduct under the failure-to-adopt-a-policy theory").

With respect to the first element, Plaintiffs do not explain how McKinney's training was inadequate. In fact, they argue that McKinney had no authority to approve a prisoner for transport, [R. 153, pp. 14–15], so it is unclear why they believe that prisoner transport screening should have been included in her training. Presumably, Plaintiffs believe that the failure to develop a written prisoner transport screening policy for intersystem or interstate transfers (i.e., long-distance transports) is an inadequacy in and of itself. However, they do not explain what an adequate policy would have looked like, or why Correct Care's other policies and practices were inadequate with respect to assessing a prisoner for long-distance transport. For example, Correct Care had a written "Transfer Screening" policy, which was "intended to ensure that a transfer screening is performed by qualified healthcare professionals on all intrasystem transfers." [R. 155-2, p. 10] Correct Care also had a written "Continuity and Coordination of Care During Incarceration Policy" intended to ensure the proper coordination and monitoring of health care services from admission to discharge. *Id.* at 11–14. These policies did not mandate medical assessments for inmates that would be transferred to other facilities. However, Dr. Teresa Wallace, Correct Care's health services administrator, testified that, while there was no requirement that an inmate receive a full medical assessment (including the taking of vital signs) prior to transport, the nurses or doctors could use their own judgment to determine if it was necessary to take an inmate's vital signs prior to transport. [R. 149-5, p. 20–21] Plaintiffs do not explain how this practice was inadequate.

Even if Plaintiffs could demonstrate inadequate training or policies, Plaintiffs must also prove that the inadequacies were the result of Correct Care's deliberate indifference. To show such deliberate indifference, Plaintiffs must demonstrate that Correct Care failed to "provide adequate training in light of foreseeable consequences that could result from a lack of instruction" or a failed to act "in response to repeated complaints of constitutional violations by its officers." *Winkler*, 893 F.3d at 902 (quoting *Ellis*, 455 F.3d at 700–01) (internal quotation marks omitted).

With respect to the latter mode of proof, Plaintiffs have not presented any evidence of any previous complaints related to the medical staff's evaluations of prisoners for transport. Plaintiffs also fail to demonstrate that Correct Care failed to provide appropriate training "in light of foreseeable consequences that could result from a lack of instruction." This mode of proof "is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Shadrick*, 805 F.3d at 739 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

On this point, Plaintiffs argue that Correct Care's "contractual promise to screen inmates for transport demonstrates its knowledge that transport screening would be a recurring situation, and that an absence of screening could violate an inmate's constitutional rights." [R. 153, p. 16] However, Dr. Carl Keldie, Correct Care's senior vice president of clinical affairs, testified that long-distance transports like Culpepper's were not common occurrences. [R. 149-6, p. 23]. He was asked, "Was it anticipated by [Correct Care] that their employees would be called upon to determine whether an inmate patient was medically fit to be transported a significant distance from the jail . . . to another facility?" *Id.* He responded, "In some ways, neither [the national

accreditation agency] nor [Correct Care] anticipated transfers of patients long distances."[13] *Id.* Plaintiffs have failed to demonstrate that long-distance transports were of such a recurring or frequent nature that it was reasonably foreseeable an absence of a written policy specific to such transports would result in constitutional violations. Further, Plaintiffs fail to explain how Correct Care's practices (for the more common intrastate or short-distance transfers) were inadequate, such that the lack of a written policy specific to screenings for long-distance transports would create a foreseeable consequence of constitutional violations. *See Wilkins*, 517 F. App'x at 321 (addressing a claim that municipality failed to have adequate procedures in place and finding "the fact that alternative procedures might have better addressed [the plaintiff's] particular needs does not show that the [City] was deliberately indifferent" (quoting *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004))); *Swan by Carrello v. Daniels*, 923 F. Supp. 626, 633 (D. Del. 1995) (finding that defendant's procedures were not "so meager and inadequate that [the defendant] should have known they 'would be ineffectual in preventing specific violations of constitutional rights'" (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1071 n.28 (3d Cir. 1991))). Stated another way, Plaintiffs fail to explain how the lack of a policy specific to the rare occurrence of an interstate transport "put [Correct Care] on notice of the likelihood that [its employees like Nurse McKinney] would respond inadequately to an inmate's medical emergency." *Winkler*, 893 F.3d at 903.

Lastly, the Court notes, even if Plaintiffs could demonstrate Correct Care's deliberate indifference with respect to training its medical personnel, they have failed to prove a direct causal link between the inadequate training and the constitutional violation. According to the evidence of record, McKinney became involved with Culpepper's case because she was asked to

---

[13] According to Dr. Keldie, the national accreditation agency's policies were "directly intrasystem," and were silent on intersystem transfers, such as an inmate being transferred from a local jail to a federal prison. [R. 149-6, p. 23]

bring his medications to the transport officer. There is no evidence that she was expected to assess him or approve him for transport, and Plaintiffs argue that she had no such authority. Further, she immediately sought assistance from the nursing director upon learning that Culpepper had stomach pain, and she only returned to the booking area with his medications after being told by her superior that he was ready for transport. There is no evidence that McKinney would have acted differently had she received additional training on screening prisoners for transport—something that she did not do in this case.

Finally, the Court will address two other pieces of evidence that Plaintiffs argue create genuine issues of material fact precluding summary judgment and specifically rebut Correct Care's claim that Culpepper failed to inform them of his stomach problems. First, Plaintiffs point to the absence of a medical history and physical examination of Culpepper within fourteen days of his arrival at the jail, per Correct Care policy, "which would have revealed his complaints of stomach pain and history of ulcers." [R. 153, p. 4] Defendants do not dispute this fourteen-day examination was not performed. Defendants point out, however, that Culpepper did receive an intake screening, an initial mental health evaluation, and a follow-up mental health consult within fourteen days. [R. 149, p. 5] In his initial screening, Culpepper advised the medical staff concerning his diabetes, but failed to notify them concerning any stomach problems. *Id.* at 5; [R. 151, pp. 34–44]

To the extent Plaintiffs argue liability should be imposed against Correct Care for failure to follow its policy for the provision of a medical history and physical examination to inmates within fourteen days, this theory of liability is wholly undeveloped. To succeed on such a claim, Plaintiffs would have to "present proof of a persistent pattern of unconstitutional conduct, and that [Correct Care] had constructive notice of that pattern." *Winkler*, 893 F.3d at 902.  They

have failed to do so. To the extent they cite to this evidence to argue that had such a medical history and examination been conducted, then Culpepper's history of stomach ulcers would have been in Culpepper's chart for Nurse McKinney to view (and presumably she then would have halted the transport or conducted a more thorough assessment of his medical condition before transport), such an argument is speculative. Remember, Culpepper failed to convey his history of stomach ulcers to medical staff during his initial screening. [R. 151, pp. 134–44] There is no reason to believe he would have remembered to include this information during the fourteen-day medical history. Furthermore, had Culpepper's medical records revealed a history of ulcers, such would not have affected Nurse McKinney's actions because she sought out Pittman, her supervisor, who ultimately engaged with Culpepper and made the decision to release him for transport.  That is, the alleged inadequacy in failing to conduct the fourteen-day medical history is not closely related to Culpepper's injury. *Winkler*, 893 F.3d at 902.

The second piece of evidence Plaintiffs point to is the sworn statement of Kevin Williams, a cellmate of Culpepper. [R. 153-6] They argue this statement demonstrates that Culpepper "repeatedly complained verbally and in writing to [Correct Care] medial staff at the Jail of severe stomach pain he attributed to a bleeding ulcer." [R. 153, p. 4; R. 153-6] Even accepting this statement as true, it amounts to a theory of liability against Correct Care for having a custom or policy of "inaction" in the face of unconstitutional conduct by Correct Care's employees. *Winkler*, 893 F.3d at 902. But as with the fourteen-day medical assessment argument, this theory is wholly undeveloped. Plaintiffs have presented no evidence that Correct Care's medical staff engaged in a clear and persistent pattern of misconduct in this regard, that Correct Care had notice of such unconstitutional conduct, that Correct Care tacitly approved or was

deliberately indifferent, or that this policy of inaction was the moving force of the constitutional deprivation. *Id.*

Further, it is unclear from the statement to whom Culpepper complained (jail staff or Correct Care), or that he failed to receive a response; Williams indicates that Culpepper "never got any response *that I know of*." [R. 153-6, p. 11 (emphasis added)] Williams also indicates that he did not communicate directly with medical staff about Culpepper's medical condition, but rather communicated with the corrections staff about Culpepper's condition. *Id.* When asked if he ever talked with any of the medical staff about Culpepper's complaints, Williams replied "[n]ot directly." *Id.* He explained that he and other inmates would stand at the window and advise that Culpepper was hurting, "and the officers . . . would always just be like 'Oh, we'll get somebody on it.' And of course, they don't ever respond to us anyways." *Id.*

These statements do not create a genuine dispute of *material* fact. A fact is material if it will affect the outcome of the litigation. *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016). "It is not enough for the party opposing the motion for summary judgment merely to point to disputes of fact." *Searer v. West Michigan Telecasters, Inc.*, 381 F. Supp. 634, 637 (W.D. Mich. 1974). Here, even if Williams's sworn statement is true and Culpepper made repeated complaints about his stomach or advised jail officers of his complaints, it would not have an effect on the claims against Nurse McKinney or Correct Care as alleged in the Complaint. If there was no indication in Culpepper's chart that he made prior complaints about stomach pain or ulcers, Nurse McKinney had no way of knowing of such complaints, so they would not affect her subjective understanding of the situation. And, as outlined above, even if she *did* know about the prior complaints, there is no indication this deficiency was closely related to or actually caused Culpepper's outcome, since Nurse McKinney immediately conferred with

Pittman, the Director of Nursing, and he ultimately cleared Culpepper for transport. With respect to Correct Care, the complaints would not affect Correct Care's liability because Plaintiffs have failed to demonstrate a pattern of inaction by its employees that rises to deliberate indifference.

Neither the lack of a specific policy covering long distance transports, nor any alleged deficiency in Nurse McKinney's training "were so obvious as to put [Correct Care] on notice that a constitutional violation was likely." *Winkler*, 893 F.3d at 904. Plaintiffs have therefore failed to demonstrate that Correct Care can be held liable under § 1983. Accordingly, the Court will grant summary judgment on Count I with respect to Defendant Correct Care.

### C. Negligence and Wrongful Death Claims (Counts II and III) – Correct Care and Nurse McKinney

As to Plaintiffs' state law claims of negligence and/or gross negligence (Count II) and wrongful death (Count III), Correct Care and Nurse McKinney argue that they are entitled to summary judgment because (1) the acts or omissions of PTS and its officers were the superseding cause of Culpepper's death, thereby relieving Correct Care and Nurse McKinney of liability, and (2) Plaintiffs have failed to produce an expert opinion regarding the allegedly negligent care of Nurse McKinney. The Court agrees that Plaintiffs have failed to put forth adequate evidence of a breach in the standard of care and causation and therefore both the negligence and wrongful death claims must fail. Accordingly, the Court does not address the superseding negligence arguments.

As noted above, a negligence claim requires the existence of a duty of care, a breach of that duty, and an injury caused by that breach. *Wright*, 381 S.W.3d at 213. Similarly, Kentucky's wrongful death statute, KRS § 411.130(1), provides, "Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it." Here, then,

Plaintiffs must show that Nurse McKinney owed Culpepper a duty of care, that she breached that duty, and that Culpepper's death was actually and proximately caused by that breach.[14] Causation is an essential element of both the negligence and wrongful death claims. *See Colston v. Regency Nursing, LLC*, 2018 WL 775367, at *3.

In the present case, Defendants Correct Care and McKinney point to a report written by their nursing expert, Nancy Booth, RN, MSN, CCM, CCHP-RN. [R. 157-1] In her report, Booth notes that Nurse McKinney, an LPN, did not render care to Culpepper, nor did she physically assess Culpepper. *Id.* at 1. In fact, according to Booth, an LPN works under the direction of a registered nurse, and the scope of an LPN's practice "limit[s] the LPN from acting independently when assessing, planning, implementing, and evaluating a patient's care." *Id.* at 2. Accordingly, when Nurse McKinney "realized that [Culpepper's] complaint was beyond her capabilities to assess," she contacted the nursing director Pittman. *Id.* at 3. At the time, Pittman was a registered nurse, or RN. [R. 154-6, p. 10] Booth opines that Nurse McKinney's "decision to request the nursing judgment of the Director of Nursing refutes any question that she was negligent or otherwise deliberately indifferent to the decedent's complaints." *Id.* Though she does not state it so precisely, Booth essentially opines that Nurse McKinney did not violate the applicable standard of care.

Defendants Correct Care and McKinney have therefore identified portions of the record "which [they] believe demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Essentially, they have demonstrated an *absence* of a necessary element

---

[14] To the extent that Plaintiffs attempt to assert a negligence claim against Correct Care directly, rather than under a theory of vicarious liability, their argument is wholly undeveloped. In their Response to Correct Care and Nurse McKinney's Motion, Plaintiffs briefly argue that Correct Care failed "to provide any written direction or training on how and by whom an inmate should be screened prior to transport, and what should be done in light of the results of that assessment." [R. 153, p. 19] Plaintiffs offer no support (or even argument) as to the applicable standard of care for such a claim.

of the negligence claim—i.e., the breach of a standard of care. The burden is therefore on Plaintiffs to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc.*, 48 F.3d at 205 (citation omitted).

As to Nurse McKinney, Plaintiffs argue, "Although McKinney's deposition testimony demonstrates that she knew she had no qualifications to screen Culpepper for transport and should have summoned a more qualified medical professional to do so, a reasonable jury could conclude that she didn't." [R. 153, p. 19] Relying on that theory, Plaintiffs argue that McKinney effectively abandoned Culpepper "by failing to do anything for Culpepper despite his documented condition, and his appearance and complaints the morning of January 29." *Id.* Plaintiffs do not cite to any facts or any portion of the record to support this argument.

To the extent that Plaintiffs rely on the deposition testimony of Pittman, the nursing director, and his inability to recall his interactions with Culpepper, the Court has already addressed the inadequacies of that argument above. The evidence of record clearly demonstrates that Nurse McKinney immediately sought assistance upon learning of Culpepper's complaints of stomach pain. Her testimony is corroborated in part by the testimony of PTS Officer Earnhart, who witnessed a male member of the medical staff return to the booking area with Nurse McKinney, and Pittman's own signature on the Patient Prescription Eligibility Form. There is no evidence to corroborate Plaintiffs' theory that Nurse McKinney simply abandoned Culpepper and did not seek assistance. The Court therefore finds that Plaintiffs have failed to satisfy their burden of demonstrating a genuine issue of material fact with respect to the necessary element of a breach in the standard of care.

Further, Plaintiffs have not produced sufficient evidence of causation. In Kentucky, "expert opinion is [typically] required to establish causation in a medical malpractice suit." *Ashland Hosp. Corp. v. Lewis*, 581 S.W.3d 572, 578 (Ky. 2019) (citations omitted). This expert-testimony requirement exists because "[m]ost medical malpractice claims involve issues of science or professional skill outside the ordinary experiences and range of knowledge of typical jurors and judges." *Id.* (quoting *Adams v. Sietsema*, 553 S.W.3d 172, 179 (Ky. 2017)). As a result, most "medical malpractice claims cannot be proven without expert opinion testimony to establish that the conduct in question departed from the applicable standard of care and was a proximate cause of the damages claimed." *Id.* (quoting *Adams*, 533 S.W.3d at 179).  There are two exceptions to this expert testimony requirement: when the defendant-physician makes an admission such that his or her negligence is apparent, and res ipsa loquitor. *Id.* Neither applies in this case (and Plaintiffs do not argue for their application).

Plaintiffs have failed to provide any expert opinion regarding causation in this case. In fact, Plaintiffs' response to this motion for summary judgment, [R. 153], does not even address the issue of causation with respect to these two state law claims. Accordingly, Plaintiffs' negligence claim and wrongful death claim (which in this case is based on alleged medical negligence) must fail for lack of proof of causation. *See Colston*, 2018 WL 775367, at *3.

In sum, the Court will grant summary judgment on all claims against Defendants Correct Care and McKinney because (1) there is no genuine issue of disputed fact as to whether Nurse McKinney was deliberately indifferent to Culpepper's medical need on the day he left LMDC; (2) there is no evidence that Correct Care's alleged failure to train its employees on evaluating prisoners for transport was the result of Correct Care's deliberate indifference; and (3) Plaintiffs have failed to demonstrate a genuine issue of disputed fact with respect to a breach in the

applicable standard of care, and they have not provided the necessary expert opinion on causation, a necessary element of their negligence and wrongful death claims. Because the Court is granting summary judgment on all claims against Correct Care and Nurse McKinney, it need not address their arguments regarding punitive damages. *See* [R. 149, p. 19].

## V.   CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part the Missouri Defendants' Motion for Summary Judgment and grant Correct Care and Nurse McKinney's Motion for Summary Judgment. Plaintiffs' remaining claim is Count I, their § 1983 claim for deliberate indifference, against Defendants Dorris and Altamirano.

Accordingly, it is **HEREBY ORDERED** as follows:

1.  The Missouri Defendants' Motion for Summary Judgment, [**R. 130**], is **GRANTED IN PART** and **DENIED IN PART**.

    a.  The Motion is **DENIED** to the extent it seeks summary judgment on Count I (§ 1983) with respect to Defendants William Dorris and Faith Altamirano.

    b.  The motion is **GRANTED** to the extent it seeks summary judgment on Count I (§ 1983) with respect to Defendants Hutcheson, Moore, and Mississippi County.

    c.  The Motion is **GRANTED** to the extent it seeks summary judgment on Count II (negligence/gross negligence) and Count III (wrongful death) with respect to all Missouri Defendants.

2.  Correct Care and McKinney's Motion for Summary Judgment, [**R. 149**], is **GRANTED** as to all counts against Defendants Correct Care and McKinney.

This the 31st day of March, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY